
George C. Paine, II
US Bankruptcy Judge
Dated: 11/16/09



# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **ADAM STERN HOMES, INC.** | ) | Case No.: 08-02634-GP3-7 |
| | ) | Chapter 7 |
| and | ) | Hon. George C. Paine II |
| | ) | |
| **DANIEL ADAM STERN and** | ) | Case No.: 08-02634 |
| **SHELIA SUE STERN,** | ) | Chapter 7 |
| Debtors | ) | Hon. George C. Paine II |
| | ) | |
| **ROBERT H. WALDSCHMIDT,** | ) | |
| Chapter 7 Trustee | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Adv. No.: 08-0361A |
| | ) | |
| **HENRY L. PARROTT, JR. AND** | ) | |
| **PATRICIA PARROTT** | ) | |
| Defendants | ) | |

_____
## MEMORANDUM OPINION
_____

Robert H. Waldschmidt, as chapter 7 trustee of Adam Stern Homes, Inc. ("ASHI") and Daniel Adam and Shelia Sue Stern (hereinafter "trustee"), seeks to recover $33,160.70 for labor and materials provided by Debtor Adam Stern Homes, Inc. for the construction of Henry and Patricia Parrott home on theories of fraudulent transfer pursuant to 11 U.S.C. § 548(a)(1)(B), breach of contract or quantum meruit. The trustee also seeks to recover Shelia Stern's realtor

commission as a contract third-party beneficiary, unjust enrichment and/or fraudulent conveyance.

For the reasons contained herein, the court finds that ASHI fraudulently conveyed labor and materials in the amount of $31,260.07 which may be recovered by the trustee for the benefit of the ASHI estate pursuant to 11 U.S.C. §§ 542 and 548. Further, the court finds that the trustee (as trustee for Daniel Adam and Shelia Sue Stern) was unable to establish all essential elements of his case to recover Shelia Stern's realtor commission. The following constitute findings of facts and conclusion of law. Fed. R. Bankr. P. 7052(a).

### A. FACTUAL BACKGROUND

The parties stipulated to the following facts:

**Adam Stern Homes, Inc.**

1. Adam Stern Homes, Inc. ("ASHI") filed a voluntary petition under Chapter 7 on March 28, 2008.

2. Robert H. Waldschmidt was appointed as Trustee in the ASHI case, and is currently serving in that capacity.

3. ASHI was engaged in the business of constructing residential homes in Tennessee.

4. On July 12, 2006, ASHI entered into a contract to construct a home for Henry & Patricia Parrott, and to furnish all of the labor,

                materials, equipment, and tools to construct the home at 1709 Championship Blvd., Franklin, Tennessee, in Westhaven Subdivision.

     5.      Under the terms of the contract, ASHI was to receive fees of $45,000 for the construction of the home ($10,000 as an overhead fee, and $35,000 for supervisor fees).

**Sheila Stern**

     1.      Sheila Sue Stern ("Stern") filed a voluntary petition under Chapter 7 on March 28, 2008.

     2.      Robert H. Waldschmidt was appointed as Trustee in the Stern case, and is currently serving in that capacity.

     3.      Stern worked at Keller Williams Realty at least through November, 2007.

     4.      On or about June 30, 2006, Henry & Patricia Parrott ("Parrotts") entered into a Homesite Purchase and Construction Agreement with Westhaven Partners, LLC for the purchase of Lot 229 Section 11 in Westhaven, 1709 Championship Blvd. Franklin, Tennessee.

     5.      The purchase price of the lot was $157,107.

     6.      A commission was paid to Keeler Williams for the purchase of the lot, but no other commissions have been paid by the Parrotts (or anyone else to the knowledge of the parties) relating to the construction of the home.

Stipulations, Docket No. 29, 08-0362A, Oct. 13, 2009.

Shelia and Adam Stern met Henry and Patricia Parrott at a church meeting held at the Parrott's residence in 2006. The group met every other week at the Parrotts house for an extended time. By all accounts, the couples became close friends and even vacationed together. At the time the couples met, Adam Stern had

Page 3

been struggling to run ASHI, his undercapitalized, construction business since 2000. In 2005, Shelia Parrott had became a licensed realtor working for Keller Williams Realty. Patricia Parrott is an interior designer, and Henry Parrott, an estate and financial planner, worked with the Sterns in that capacity after they became acquainted.[1] During this time the Parrotts had been working with a realtor looking to purchase a new home. When their realtor was no longer able to represent them, the Parrotts decided to hire Shelia Stern as their realtor in early 2006.

Patricia Parrott found a vacant lot in the Westhaven subdivision, and told the Sterns that they would like to purchase the lot and build a custom home. The Parrotts decided to hire Adam Stern Homes, Inc. to build their custom home. As a friend and president of ASHI, Adam Stern agreed that ASHI would construct the home for the Parrots on the following terms on July 12, 2006:

> 1. THE WORK. The Builder shall furnish all labor, materials, equipment, and tools for the construction of a home . . . in accordance with the Plans and Specifications dated July 12, 2006. . .
>
> 2. AGREEMENT AMOUNT. The Buyer shall pay to the Builder for the performance of the work the sum equal to all actual costs of construction, including but not limited to: materials, labor, sale tax, permit fees, delivery

---

[1]The Sterns and Mr. Stern's parents both met with Mr. Parrott in his capacity as a financial planner. Mr. Parrott testified that it is his job to discover a client's assets and liabilities to help them set long-term goals. Mr. Parrott, was therefore, familiar with the Stern's struggling business.

fee, subcontractor costs, insurance, real estate commissions and any other costs or fees either directly or indirectly associated with the construction of the house, plus builder overhead of <u>Ten thousand Dollars</u>, ($10,000) and builder supervision fee of <u>Thirty-five thousand Dollars</u> ($35,000). The Buyer shall pay all costs of construction of any nature.

5. DRAW SCHEDULE. The Buyer shall make progress payments to the Builder as needed to pay for the costs of construction. . . . The Buyer shall deposit with the Builder a sum equal to the Builder draw request immediately upon receipt of same. At the end of each calendar month, the Builder will provide an accounting from the sums actually paid that month and a budget analysis for the house. . .

8. CHANGES IN WORK. No substantial changes will be made without a signed Change Order. The costs of any alteration, additions, omissions, or deviations from the Plans and Specifications at the request of the Buyer is extra and shall be billed at Builder's cost plus 15% and added to the Agreement amount. The change order amounts shall be paid in full at the signing of the change order. Any changes will add additional time to the contract completion date.

Thus, the contract provided that ASHI would build the Parrotts home regardless of the cost, for a $45,000 flat fee, unless changes and additions were made, in which case the builder's fee would amount to 15% above cost of the new addition.[2]

The Parrotts executed a "Buyer Representation Agreement" wherein Shelia

---

[2] The Parrotts allege that the parties stipulation that "ASHI was to receive fees of $45,000 for the construction of the home ($10,000 as an overhead fee, and $35,000 for supervisor fees)" precludes any other fees sought by ASHI for the 15% on "new orders." The court disagrees. The stipulation is that ASHI agreed to the $45,000 flat fee for construction of the house as proposed in the plans, regardless of its cost. However, this stipulation does not wipe out the contractual provision that allows ASHI the 15% builders fee on the new orders.

Page 5

Stern was to be their realtor for the purchase and/or construction of a home. The contract provided that Keller Williams was authorized to negotiate a fee paid by the Seller (Westhaven d/b/a Southern Land) or Seller's agent. In connection with the Parrott's purchase of the Westhaven homesite, they signed a "Homesite Purchase and Construction Agreement" and an "Addendum" thereto that provided the following respectively, concerning the realtor commissions:

> 8. <u>Construction</u>. . .
> Purchaser (Parrotts) acknowledges that Westhaven Realty dba "Southern Land" is the exclusive listing broker for the initial lot sales at Westhaven and for homes constructed at Westhaven by any Master Builder. . . .  Purchaser acknowledges that Southern Land will receive a marketing fee (the "Marketing Fee") from the Master Builder who constructs a home on the Property. . . equal to six and one-half percent (6.5%) of the Total Price. . .

> 2) Buyer (Parrotts) understands there will be a 6.5% Marketing Fee included in the Total Cost of the construction of the home to be built by Adam Stern Homes; less the cost of homesite 229. Marketing fee to be paid on total purchase price of Home, less the cost of homesite 229 at time of closing.

Both documents are signed by the Parrotts. The construction contract between the Parrotts and ASHI does not mention the marketing fee specifically and states only the following with respect to the real estate commission:

> 20. REAL ESTATE: 3 ½% Southern Land, 3% Keller Williams.

Before purchasing the homesite, the Parrotts also included in the "Addendum" a condition precedent based upon excavation costs. The provision stated:

> Purchase Agreement is contingent upon buyer determining cost of excavation of homesite, This contingency expires on July 21, 2006 at which time Buyer and Seller have a binding agreement unless state in writing beforehand. Buyer has a 48 hour right of first refusal.

The Parrotts and ASHI met at the homesite. According to Mr. Stern's testimony, based on his experience and meetings with subcontractors, he gave his best estimate as to excavation costs.[3] The Parrotts and ASHI disagree as to what Adam Stern stated the excavation costs would be, but the Parrotts decided to waive the condition and proceed with the sale of the homesite and construction with ASHI.

After construction began, excavation costs were higher than the Parrotts anticipated and the tension between the parties began to develop. The Parrott allege that ASHI breached the construction contract by proceeding with excavation in excess of the original estimate without their prior permission. The Sterns testimony is that the Parrotts knew of the excavation costs and that Mr. Stern's

---

[3]The Sterns and Mr. Parrott gave contradictory testimony on most every construction cost issue. The court found Mr. and Mrs. Stern to be credible witnesses. They had no incentive to increase costs on the construction project as ASHI was being paid a flat fee. Furthermore, they had no monetary motivation for their testimony as all recovered money goes to their bankruptcy estates. Sterns demeanor and testimony presented to the court as most believable.

estimate was not a guaranteed figure as rock excavation in the Nashville area is notoriously unpredictable.[4]  Nevertheless, the parties proceeded with construction.

Mr. Stern testified, that the Parrotts also asked for a larger retaining wall in the back yard with a waved design.  The larger wall required more excavation and this too increased the cost of the project.  Mr. Parrott testified that it was ASHI who built the larger than required retaining wall without the Parrott's initial input.  The extra money that the Parrotts had to pay for excavation and the retaining wall should, according to the Parrotts be used to mitigate any damages sought by ASHI.  The Parrotts feel that ASHI should bear this cost of construction or at the very least, this was a material breach by ASHI that occurred prior to any breach by the Parrotts.[5]

Mr. Stern testified that the other major cost difference was the Parrott's decision to finish and complete a 5000 square foot house instead of the original

---

[4] Besides crediting Mr. Stern's testimony about rock conditions in Nashville, the court likewise takes judicial notice of this fact.  Judicial notice of a fact is generally only appropriate when there is no dispute regarding the fact. **Scotty's Contracting and Stone, Inc. v. U.S.** 326 F.3d 785, 790 (6th Cir. 2003).  There was no contrary testimony as to rock conditions in the Nashville area, and this court is well aware of the volume of litigation that has resulted in this district about the rocky terrain.

[5] The Parrotts and the Sterns testimony about the retaining wall was completely inapposite.  The court found the Sterns to be the more credible witnesses.

Page 8

4000 square feet contained in the contract. According to Mr. Stern's testimony, this increased the overall cost of every trade related to the additional square footage, and that although the original plans envisioned a "Chevy" of the house, the Parrotts wanted a "Cadillac" for the Chevy price. The Parrotts acknowledge this change, but felt that the increased trade costs exceeded the actual expense of finishing out the additional square footage.

ASHI continued to build the Parrotts' home which was near completion by the summer of 2007. According to the draw schedule as set forth in the contract, ASHI presented draws for construction costs, which were paid by the Parrotts up until July 2007. At that point, ASHI presented an invoice for $71,208.39 to the Parrotts. On July 23, 2007, Mr. Parrott called ASHI to say that his bank would not fund the draw because the amount requested did not correspond to the percentage that the house was complete. Mr. Stern testified that this was due in large part to the additional square footage that the Parrotts decided to complete that was not included in the funding of the Parrott's bank loan. ASHI informed the Parrotts that regardless of the bank's position on completion, the contract required immediate payment by the Parrotts on all submitted draws. ASHI told the Parrotts that work would materially cease until the draw had been paid. The Parrotts allege that ASHI breached the contract when it refused to complete construction.

After several e-mail exchanges and meetings, the parties were unable to reconcile their differences. ASHI suspended all work and eventually left the jobsite. At the time work was suspended on the house, the trustee contends that ASHI had incurred construction costs of $544,952.32 and had earned $43,267.50 toward the overhead and supervisor fee. The trustee's proof indicates that ASHI received a total of $555,059.12 from the Parrotts, but has not received payment or reimbursement from the Parrotts for the balance of $33,160.70.

The trustee asserts that the costs incurred by ASHI but were not paid for amount to fraudulent conveyances. Further, the trustee claims that the realtor fee earned by Shelia Stern but not paid by the Parrotts is recoverable by Shelia Stern's estate as a fraudulent conveyance, a breach of the construction contract by the Parrotts or a quantum meruit basis. The Parrotts argue that ASHI materially breached the contract first, and that any sums due and owing are more than offset by damages resulting from ASHI's multiple breaches of the contract.

## B. DISCUSSION

1. **ASHI FRAUDULENT CONVEYANCE CLAIM**
U.S.C. § 548 provides in relevant part:

(a)    (1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment

Case 3:08-ap-00361    Doc 34    Filed 11/16/09    Entered 11/16/09 15:55:53    Desc Main
Document      Page 10 of 20

contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily ….

  (B) (I) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

    (ii) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

The first element that must be proved is the existence of a transfer to be avoided. As defined by the Bankruptcy Code and for the purposes of avoidance under § 548, the term "transfer" means

 (A) the creation of a lien;

 (B) the retention of title as a security interest;

 (C) the foreclosure of a debtor's equity of redemption; or

 (D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with-

  (i) property; or
  (ii) an interest in property.

11 U.S.C. § 101(54). As noted by the Bankruptcy Court for the Eastern District of Tennessee in **In re Webb Mtn. LLC,** 414 B.R. 308 (Bankr. E.D. Tenn. 2009):

Page 11

> "Congress intended the term 'transfer' to be as broad as possible and, therefore, defined the term expansively in the Bankruptcy Code." **Ford v. Skorich (In re Skorich)**, 337 B.R. 441, 445 (D.N.H.2006). "Under this definition, any transfer of an interest in property is a transfer, including a transfer of possession, custody, or control even if there is no transfer of title, because possession, custody, and control constitute interests in property." **Lemley-Cabbiness Farms v. FDIC (In re Lemley Estate Bus. Trust)**, 65 B.R. 185, 189 (Bankr. N.D. Tex. 1986) (citing S.Rep. No. 95-989, 95th Cong.2d Sess. 26-27 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5811-13). As contemplated within and under the Bankruptcy Code, "[t]he definition of transfer focuses on what the debtor relinquished[,] not the formalities of the documentation." **Rosen v. MIF Realty, L.P. (In re Vuckovic)**, 211 B.R. 1002, 1005 (Bankr. M.D.Fla. 1997) (stating that "[u]nder this analysis, almost every business transaction constitutes a transfer.").

**Webb Mtn. LLC,** 414 B.R. at 353-354. In this case, focusing either on the contract or on what the debtor actually relinquished, ASHI's provision of labor and materials unquestionably qualifies as a "transfer" under the Bankruptcy Code's broad definition.

The second element of a fraudulent conveyance requires that the debtor did not receive "reasonably equivalent value" for the transfer. Judge Stair in **Webb Mtn. LLC** highlights the difficulty of this inquiry:

> The Bankruptcy Code does not define "reasonably equivalent value," although "[v]alue has been defined as that which provides an economic benefit, either direct or indirect, to the debtor." **Lisle v. John Wiley & Sons, Inc. (In re Wilkinson)**, 319 B.R. 134, 138 (Bankr. E.D. Ky. 2004). "In assessing whether a challenged transfer is supported by

Page 12

reasonably equivalent value, courts generally compare the value of the property transferred with the value of that received in exchange for the transfer." **Corzin v. Fordu (In re Fordu)**, 201 F.3d 693, 707 (6th Cir.1999). "[I]t is clear that the debtor need not collect a dollar-for-dollar equivalent to receive reasonably equivalent value." **Butler Aviation Int'l. v. Whyte (In re Fairchild Aircraft Corp.)**, 6 F.3d 1119, 1125-26 (5th Cir.1993). Clearly, "the contractual right to receive payment in the event that it turns out well is obviously worth something." **Allard v. Flamingo Hilton (In re Chomakos)**, 69 F.3d 769, 771 (6th Cir. 1995). Nevertheless, "valuation considerations are inherently fact-laden, turning on the case-specific circumstances surrounding the debtor's decision to enter into the challenged transaction." **Lowe v. B.R.B. Enters., Ltd. (In re Calvillo)**, 263 B.R. 214, 220 (W.D. Tex. 2000).

**Webb Mtn. LLC,** 414 B.R. at 354-355. The proof at trial submitted by the trustee shows services and costs expended by the debtor in the amount of $31,260.07.[6] The costs incurred by ASHI for labor and materials increased the value of the Parrott's house but were not paid for by the Parrotts. In other words, the transfers made by ASHI in the form of labor and materials were done so without reasonably equivalent value.[7]

The Parrotts offered extensive, yet irrelevant, proof of what they claimed were

---

[6] The amount sought in the trustee's complaint was $33,160.70, but the Parrotts offered proof at trial that they paid one bill of $1,900 directly, and the court, therefore, reduces the trustee's recovery accordingly.

[7] The Parrotts argue that the proof at trial demonstrated that ASHI did not actually pay some of the bills for which it now seeks to recover payment from them. The Parrotts received the benefit of the materials and labor provided by ASHI and its subs. Whether ASHI completely paid all its subcontractors does not change the fact that the Parrotts received the labor and materials.

Page 13

"setoffs" of the value of labor and materials provided. In the Parrotts view, the extra costs incurred as a result of ASHI's breach of the contract subsume any amounts still owing under their contract with ASHI.

The court finds that it is not necessary to consider the claims that the Parrotts may have against the ASHI estate in determining whether "reasonably equivalent value" was given to ASHI for the labor and materials furnished. The Parrotts were having a custom home built for them by a close friend for a minimal overhead and supervisor fee no matter what the scope of the construction costs. ASHI had no incentive to increase the costs of the construction to obtain a higher fee. The Parrotts, on the other hand, decided to build a nicer home than what the parties had originally contemplated, and the costs of construction, therefore, rose.

The debtor provided the labor and materials and almost completed the house before disputes erupted and ASHI left the job following the Parrott's non-payment. The issues that the Parrotts want to raise in defense to the trustee's action are claims they might have against the estate, but are not relevant to whether ASHI transferred labor and materials that were not paid for. Setoff by the Parrotts for other phases of construction that they were unhappy with does not supply reasonably equivalent value for the unpaid labor and materials. **See Nostalgia**

**Network, Inc. v. Lockwood,** 315 F.3d 717 (7th Cir. 2002) ("the inquiry should stop at the first state of analysis, that it, should stop after it is determined that the transfer was not supported by consideration. If it was gratuitous, the fact that some or for that matter all of it may have seeped back to the debtor does not legitimize the transfer"). Accordingly, the court finds that the trustee has shown that the transfers lacked "reasonably equivalent value.[8]

Insolvency at the time of the transfer is the final element under § 548(a)(1)(B) and is defined in § 101(32)(A) as follows:

(A) with reference to an entity other than a partnership and a municipality, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of-

    (i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and

    (ii) property that may be exempted from property of the estate under section 522 of this title[.]

---

[8] Even if the court considered all of the Parrott's defenses to the trustee's action in the context of reasonably equivalent value, the court's findings would not change. The Parrotts agreed to pay all costs of construction, not just the ones that fell perfectly in line with the "Chevy" estimate. The court simply found that Sterns more credible witnesses. Although the Parrotts may believe their position is correct, the proof at trial indicates that this was a house that was simply more expensive than the Parrotts thought it would be and involved garden-variety contractor/homeowner disputes that typically arise.

11 U.S.C. § 101(32)(A) (2005). Judge Stair also explains what insolvency means in the context of a § 548 action in **Webb Mtn. Ltd.**:

> "Insolvency for the federal causes of action is limited to balance sheet insolvency. 'Insolvency ... is basically a balance sheet test: that is, a debtor is insolvent when the debtor's liabilities exceed the debtor's assets, excluding the value of preferences, fraudulent conveyances and exemptions.'" **Silagy v. Gagnon (In re Gabor)**, 280 B.R. 149, 160 (Bankr. N.D. Ohio 2002) (quoting **Foreman Indus., Inc. v. Broadway Sand & Gravel (In re Foreman Indus., Inc.)**, 59 B.R. 145, 149 (Bankr. S.D. Ohio 1986)).

**Webb Mtn Ltd.**, 414 B.R. at 355. ASHI and the Sterns' statements and schedules and the uncontradicted testimony all establish that the debtors were insolvent at the time of the transfers. The court finds that ASHI and the Sterns were insolvent at the time the labor and materials were provided to the Parrotts.

The trustee successfully established all necessary elements pursuant to 11 U.S.C. § 548 to show that ASHI transferred labor and materials in the amount of $31,260.07 to the Parrotts without reasonably equivalent value at a time when ASHI was insolvent. The court, therefore finds in favor of the ASHI trustee on the fraudulent conveyance count of his complaint against Henry and Patricia Parrott.[9]

---

[9]Having found for the ASHI trustee on the fraudulent conveyance count, it is unnecessary to address the trustee's breach of contract and quantum meruit theories.

Page 16

## 2. SHELIA STERN FRAUDULENT CONVEYANCE/BREACH OF CONTRACT

The Shelia Stern trustee also seeks to recover Shelia Stern's realtor commission with respect to the sale and construction of the Parrott's home against the Parrots. The fraudulent conveyance statute cannot be stretched wide enough to recover this money for Shelia Stern estate creditors. Although the proof demonstrated that Shelia Stern was insolvent at the time she provided her services to the Parrotts, the trustee cannot meet the "reasonably equivalent value" element of the statute because of the posture of this particular case and the multiple parties involved to get Mrs. Stern's commission paid. Stern's contract for real estate services gave Keller Williams the right to negotiate a fee to be paid by the Seller (Southern Land) based upon a total sales price.[10] Shelia Stern's reasonably equivalent value for her services was to come first from Keller Williams who was to be paid by Southern Land, who was to be paid by ASHI, who was to be paid by the Parrotts.[11] This is too may hoops for the court to jump through to link the reasonably equivalent value inquiry to the Parrotts payment.

---

[10] Even this Agreement does not contain specifics of the fee arrangement. The agreement is marked "n/a" as to the total sales price, and "n/a" on the % to be paid of the total sales price.

[11] There was also testimony that Shelia Stern had agreed to share a portion of her real estate commission with an agent who took over for Shelia Stern once the parties began arguing over the construction contract and with the Parrott's prior realtor.

The same is true with the trustee's breach of contract and third-party beneficiary claims. Under the modern rule, third parties may enforce a contract if they are intended beneficiaries of the contract. **Owner-Operator Independent Drivers Ass'n, Inc. v. Concord EFS, Inc**. 59 S.W.3d 63, 68 -69 (Tenn., 2001). If, on the other hand, the benefit flowing to the third party is not intended, but is merely incidental, the third party acquires no right to enforce the contract. **Id.** In order to maintain an action as an intended beneficiary, a third party must show: "(1) a valid contract made upon sufficient consideration between the principal parties and (2) the clear intent to have the contract operate for the benefit of a third party." **First Tennessee Bank Nat'l Ass'n v. Thoroughbred Motor Cars, Inc.**, 932 S.W.2d 928, 930 (Tenn.Ct.App. 1996) (citing United American Bank of Memphis v. Gardner, 706 S.W.2d 639, 641 (Tenn.Ct.App. 1985)). The evidence of intent to confer a benefit must be clear and direct:

> It must appear, in order that a third person may derive a benefit from a contract between two other parties, that the contract was made and entered into directly or primarily for the benefit of such third person, and before he can avail himself of the exceptional privilege of suing for a breach of agreement to which he is not a party he must at least show that it was intended for his direct benefit.

**Owner-Operator Independent Drivers Ass'n, Inc.,** 59 S.W.3d at 68 -69 (quoting **Abraham v. Knoxville Television, Inc**., 757 S.W.2d 8, 11 (Tenn.Ct.App. 1988)).

Case 3:08-ap-00361    Doc 34    Filed 11/16/09    Entered 11/16/09 15:55:53    Desc Main
Document      Page 18 of 20

Under the construction contract between the Parrotts and ASHI, the provision in the contract covering the amounts to be paid by the Parrotts states that the Parrotts are responsible for all costs of construction but does not mention the real estate commission. Paragraph 15 of the construction agreement states that the contract represents the parties' "entire agreement." It is only when the court looks to the agreement between Southern Land and the Parrotts that states that Southern Land will collect the marketing fee from ASHI, and the Addendum stating that the Parrotts acknowledge that the total cost of their home includes the marketing fee that the court can find reference to payments to be made by the Parrotts. This is not to say that they do not owe those payments, but the "chain of command" to get those payments to Shelia Stern is too tenuous for this court to act upon a third party beneficiary, fraudulent conveyance or other theory when the only parties before the court are ASHI, Shelia Stern and the Parrotts.

Accordingly, the court finds that the trustee is unable to carry his burden of proof on all claims relating to recovery of Shelia Stern's real estate commission directly from the Parrotts. The court is not making any finding as to the liability of the Parrotts to make this payment, but finds at this time, that the Shelia Stern trustee cannot recover directly from the Parrotts. The court therefore dismisses the Shelia Stern trustee's action against the Parrotts with respect to Shelia Stern's real

estate commission.

## C. CONCLUSIONS

For all the reasons cited herein, the court finds that the trustee is entitled to a judgment against Henry and Patricia Parrott in the amount of $31,260.07 to be recovered for the ASHI's estate. The trustee's adversary proceeding in the Daniel Adam and Shelia Sue Stern bankruptcy case for recovery of Shelia Stern's real estate commission is hereby dismissed. The court instructs the trustee to prepare an order not inconsistent with this Memorandum Opinion within ten (10) days of entry of the Memorandum.

This Order has Been electronically signed. The Judge's signature and Court's seal appear at the top of the first page.
United States Bankruptcy Court.